THE STATE OF OHIO, APPELLEE, *v.* BIRNS, APPELLANT.
(Two cases.)

[Cite as State v. Birns, 10 Ohio App. 2d 103.]

(Nos. 27812 and 28002—Decided April 27, 1967.)

*Mr. John T. Corrigan*, prosecuting attorney, for appellee.
*Mr. Jack G. Day*, for appellant.

SKEEL, J.  These appeals come to this court on questions of law from a judgment entered by the trial court on the verdict of a jury finding the defendant guilty on both counts of an indictment charging him with bribery and unlawfully attempting to corrupt a witness in the discharge of his duties as a witness and as an officer of the law in the case of *State* v. *Birns* with intent to obstruct and impede or attempt to obstruct and impede the due administration of justice.

The defendant claims the following errors:

1. In repeatedly ruling on evidence and procedure, in making comment prejudicial to the defendant in the presence of the jury, and in invading the province of the jury.

2. In controlling and administering the trial and interpret-

ing the law in contravention of named provisions of the federal and state Constitutions.

3. and 4. In refusing defendant's request to charge and for errors in the general charge.

5. In prohibiting defendant in defendant's final argument to claim entrapment and the court's failure to give requested charge on that subject.

6. and 7. In overruling defendant's first motion for new trial and for failure to direct a verdict for defendant.

8. and 9. The verdict is contrary to law and is not sustained by sufficient evidence, and, by separate appeal, in overruling defendant's motion for new trial based upon a claim of newly discovered evidence.

The facts as shown by the transcript, the bill of exceptions and the exhibits are that the defendant was arrested on July 23, 1964, at 5715 Brookpark Road in the city of Parma, Ohio, and charged with promoting a numbers game or lottery known as clearing house in violation of Section 2915.13, Revised Code. The case as thus charged was pending for trial on the merits on November 20, 1964.

The defendant testified that, on November 20, 1964, he was at the "Beef and Bottle" (a lounge bar in Parma which the record shows the defendant patronized on frequent occasions) having dinner with a girlfriend and that upon leaving he saw Detective Bennett seated at the bar. He, the defendant, testified that he had only seen the officer once or twice before, one of which occasions was at the time of his arrest on July 23, 1964. After the defendant recognized the police officer, he engaged him in a conversation for more than a half hour on the subject of gambling. As set out in defendant's brief:

"There ensued an exchange of conversation and drinks during which the subject of gambling was discussed * * *. Defendant told Bennett that the Cleveland Press ran the requisite information to determine the winners in clearing house but only in editions delivered on the east side of town. * * *"

Defendant testified that the officer was amazed to know that he (Birns) was correct in his statement and that the defendant offered to demonstrate the truth thereof by bringing out papers purchased at several locations for the officer to examine. De-

fendant then arranged that he would call the officer the following week and bring the papers with him to demonstrate the truth of his statement. The meeting was to be at the "Beef and Bottle."

The defendant called Detective Bennett at the station house on Monday (November 23, 1964) at about 3 p. m. and said he had the newspapers. They agreed to meet at the "Beef and Bottle" at about 7:45 p. m. Detective Bennett, with Detective Eschweiler, then equipped themselves with sound equipment to record the conversation between the defendant and Bennett, Eschweiler to listen in his automobile at the side of the restaurant and attempt to record the conversation on a tape recorder. When the defendant reached the restaurant on November 23 at about 8:15 p. m., Bennett was sitting at the bar. The defendant testified that they had five, six or seven drinks and that he showed the newspapers to Bennett who was amazed. The defendant expressed his philosophy on the subject of gambling, that is, that it was not morally wrong to gamble, and that everybody engages in such conduct. The defendant testified that Bennett, after continuing the conversation, said:

" 'You know' he says, 'I have got four and a half or five and a half kids and I'm only making $6,500 a year.' "

Defendant further testified:

"That didn't sound good to me. I thought maybe at that moment, why would he tell me—I'm thinking like this, why would he tell me he has got five and a half kids and making $6,500 because there was nothing incriminating said, in all my conversation at the bar and I was wondering about that and I then sent for the waitress to bring a menu because I didn't have dinner yet and when the waitress brought the menu, just trying to be polite, I says 'Mr. Bennett, I am going to eat. Would you care to eat or dine with me?' He said, 'Yes, I would love to.' * * *"

The defendant stated that when the salads were on the table, "I went first. Mr. Bennett came about twenty to twenty-five seconds later. He came to the table and sat down. * * * Well when he sat down, then I was thinking about his five and one half kids that he mentioned and only making $6500 a year. I says 'Look here is a Christmas gift for your family so they will have a nice Christmas.' He looked at me and he says

'Gee.' He hesitated. He says 'Gee Whiz. What am I supposed to do for this?' I says 'Nothing.' I says 'I wouldn't want you to jeopardize your family or your kids or your job.' "

The defendant testified he laid the two hundred dollars on the table for Bennett. He also testified that after some general conversation Bennett went to the men's room. After he came back, he laid the money on the table and said "Now, Shon, tell me what you want me to do for this two hundred dollars." The defendant answered "Nothing. I have told you before that I didn't want you to jeopardize your family, your job or your kids." When pressed further as to what was expected of the police officer who, under the circumstances, was not satisfied with defendant's explanation, defendant said "Look, if you can be helpful O. K." After further conversation on this subject, a man walked slowly toward the table and Bennett said "Hello Frank—are you working tonight?" (This was Eschweiler.) The defendant then testified that all this didn't look good to him. He said "Look, I am getting out of here." He got his coat to leave and was then arrested.

The testimony of the defendant in attempting to explain how he came to give Bennett two hundred dollars (as an alleged Christmas gift on the 23rd of November, with Christmas more than a month away), when he knew that Bennett (an almost total stranger to him) was a potential or probable witness for the state in the numbers case then pending against him, was, with the exception of a few minor details, completely corroborated by Bennett. The officer's testimony on the discussion about his family was to the effect that he had just taken pictures of his children, which he displayed to Birns who then inquired about his family. Bennett, besides his work as a police officer, was in the photography business with his wife in Parma.

On the state of the record, including Birns' testimony, the issue of the defendant's guilt on either or both charges is clearly supported. The purpose of the defendant in giving two hundred dollars in cash to one known to him as a police officer who participated in his arrest on a numbers charge, which case was then pending for trial on the merits, it being undisputed that until his arrest the officer was a total stranger to him, and where there was no indication or the slightest suggestion of solicitation, for one under such circumstances to seek the company of

the officer for the purpose of explaining his philosophy on the subject of gambling and without more, with the statement "Look, here is a Christmas gift for your family so they will have a nice Christmas," is sufficient to support a guilty verdict. This evidence being given by the defendant (who has served time in a tax evasion case and in a number of other cases) also disclosed that the officer was taken by surprise when the money was offered, when, he, the defendant, testified: "He looked at me and he says 'Gee.' He hesitated. He says 'Gee Whiz. What am I suppose to do for this?'"

The defense of entrapment is not available to a defendant who creates in his own mind (without inducement by another seeking to entrap him into committing an unlawful act) the purpose to commit a criminal act and acts in furtherance of his own purpose. *State* v. *Gutilla*, 94 Ohio App. 469.

On the face of such a record, the defendant's claim of error in assignment No. 5 must be overruled, there being no evidence to suggest even entrapment. The court was correct in refusing to charge the law on that subject. Also, for the reasons set out above, claimed errors Nos. 6, 7, 8 and 9 must be overruled.

Assignment of error No. 1 is concerned with matters of procedure.

In considering the fact situation, the conclusions reached are based not only on the testimony of Detective Bennett, corroborated by the defendant's testimony, but also that of Officer Eschweiler, who had been assigned to the duty of listening to the conversation between the defendant and Bennett over certain electronic equipment. After the defendant had insisted on carrying on a discourse on gambling with an arresting officer in the numbers case, the police officer involved, either with or without the orders of the Chief of Police of the city, but at least with his knowledge and consent, took steps to use the electronic device of the city for transmitting conversations to others at a distance. Bennett concealed the transmitter on his person and the receiver, with a tape recorder, was placed in Eschweiler's personal automobile which was parked near the "Beef and Bottle" Restaurant on Pearl Road. The testimony is uncontradicted that the conversation between Birns and Bennett was clearly received and understood by Eschweiler but that the tape recording was garbled and not understandable because of the use of improper equipment. It picked up street noises

and the police radio. The jury was permitted to hear the tape with the use of earphones so that they were completely informed as to the conditions of the tape.

One other factor brought out in the record is that when Birns was arrested on July 3rd, there was, in the place where he was arrested, equipment used in conducting a numbers lottery, including tapes and money found in Birn's hat. Such property was not offered or received in evidence in this case. There is no doubt that Birns brought into the case the matter of his involvement in numbers operations so that evidence as to the manner in which such a lottery is operated was clearly proper.

On the motion for new trial because of newly discovered evidence, it was disclosed that while Detective Eschweiler was in his private automobile listening to the conversation between Detective Bennett and the defendant, one Donald E. Hale, driving his automobile on Ridgefield Road, ran into and struck the automobile in which Eschweiler was seated listening to the Bennett-Birns conversation. Eschweiler got out of his car, talked with Hale about the damage, and testified that he called the station for an officer to investigate the accident and that Officer Henry Gabriel responded in a very few minutes and took charge of the investigation, as is shown by that officer's activity report filed in the Parma Police Department November 23, 1964.

The basis of this motion for new trial is that the state did not bring the incident of this collision to the attention of the defendant, thereby depriving him of due process. Such claim is based on the alleged fact that, since Eschweiler's testimony was corroboratory in character and as the evidence of the defendant tends to show that the accident happened while Eschweiler was listening to Birns and Bennett over the electronic transmitter and that he left his listening post in his automobile for from twenty-five to forty-five minutes to investigate the accident, if the fact of the accident had not been concealed, it could have been presented to the jury to challenge Eschweiler's credibility. The state's evidence, as shown by many reliable factors, is that Eschweiler did not leave his listening post for more than five minutes and that the parts of the conversation to which he testified he had heard over the transmitter. The court, in overruling defendant's motion for a new trial on the ground of newly discovered evidence, stated that the facts as it found them to

be if presented to the jury would not within reasonable probability cause the jury to come to a different result. The credible evidence on the collision, as shown by the record, clearly supports such result.

One other factor requires this result. The defendant's testimony is not in serious conflict with that of Bennett who participated in the conversation with Birns or that of Eschweiler who listened over the broadcasting equipment. In addition to what the defendant testified on direct examination, as above set out, he testified on cross-examination as follows:

"Q. My question is this, sir: When you bought those papers did you buy them so that you could take them to the Beef & Bottle and show them to Detective Bennett? A. That is correct.

"Q. That was the only reason—you bought them? A. That is right.

"Q. And on the night in question when you came in the Beef & Bottle with those newspapers under your arm, your intention was to show these papers to Bennett and explain them to him with regard to the clearing house digits; is that correct? A. I brought those papers out to show him that his area didn't carry it and the other area did.

"Q. I see. At that time did you have any intentions of giving him a Christmas present? A. No.

"Q. When you went inside the bar and saw him there at the bar, and discussed with him showing him the manner the number was picked, the stocks and bonds, and so forth, at that time did you have any intentions of giving him a Christmas present? A. No.

"Q. How much money did you take with you when you went there? A. You mean how much money do I carry with me?

"Q. My question is, how much money did you have in your pocket on the 23rd of November, 1964, when you went to the Beef & Bottle to meet Detective Bennett? A. Well, I don't recall exactly what I had, but I had money with me.

"Q. Can you approximate how much money you had in your pocket? A. I could have had four or five hundred dollars.

"Q. Four or five hundred dollars? A. Yes.

"Q. Now, the twenty tens that you gave Detective Bennett,

did you have them in a bundle? A. I had them with my other money.

"Q. But did you have this separated from your other money? A. No, sir.

"Q. Then when you gave Detective Bennett this money how did you know you gave him two hundred dollars? A. Well, he wasn't at the table. I proceeded to the table first. It took him about twenty to twenty-five seconds to come back after that, and the only reason I done that is when he started telling me that he had four and a half or five and a half kids, and only— emphasized the word 'only'—making sixty-five hundred dollars a year.

"Q. No, my question is this, sir: I believe the testimony is that you threw twenty ten dollar bills to Detective Bennett there at the table. Now, you have told us that you had about five hundred or some odd dollars in your pocket. When did you separate the two hundred dollars that you gave Bennett in the Beef & Bottle, if at all? A. Well, I just told you that I got to the table first.

"Q. What did you do when you got to the table first? A. I went into my pocket and counted out two hundred dollars.

"Q. I see. In other words, at that point, when you were there at the booth and as Detective Bennett was behind you— A. Not as Detective Bennett was behind me. He was at the table yet.

"Q. But you didn't know where he was? A. He could have been giving a few more signals. I wouldn't know.

"Q. Well, let's understand each other. A. I understand.

"Q. You and Detective Bennett were standing at the bar; is that correct? A. We were.

"Q. And you left the bar first and went to your booth; is that correct? A. I can explain that to you, too. When I got— I'm going to explain it so you understand. I just can't give you a yes answer. I want to explain it.

"Q. Go ahead. A. We was at the bar. We had our five or six drinks. I was through having conversation with him at that time. I ordered some food from the waitress, and only out of politeness I asked him would he care to have something to eat. That is all there was. He had not accepted the food you would never have heard anything about this, but before I got to the

table he started telling me about his family and his kids, and to me, the way he said it, 'I'm only making sixty-five hundred dollars a year,' to me it looked like a beg.

"Q. I see. At any rate, when you left the bar first to go to your booth, that is when you separated the money? A. That is when I counted the money out.

"Q. Yes. And you don't know where Detective Bennett was at that time because your attention was directed to counting the money, wasn't it? A. No, I didn't see him in my presence. I didn't count the money in his presence because he wasn't there.

"Q. And when you sat down did you have this money in your hand or had you put it back in your pocket? A. I had that money in my hand.

"Q. And you held this money in your hand during the time of the preliminary conversation with Detective Bennett at the booth? A. No. Just a minute. When he sat down, the salads are on the table. That is when I took the money and I laid it down on the table. I said, 'This is a Christmas gift for your kids and your wife. See that they have a nice holiday,' because I didn't know he had five and a half kids and only making sixty-five hundred dollars, unless he told me. I thought it was a beg, so I thought it was holiday time, so I says, 'Here, have your family have a nice Christmas.' There was nothing said at the bar in reference to anything incriminating, but when he got that money, that is when all his—the things started."

As thus stated by the defendant, it is clear that the state's case is supported by the defendant's own testimony, and upon such evidence the case was correctly submitted to the jury. The absence of Eschweiler from his listening post for five minutes or less, when the conversation covered a period of time from about 8:15 to 9:30 p. m., was not, upon the record as above stated, a factor preventing defendant from being afforded due process according to law. The motion for a new trial on the ground of newly discovered evidence was, therefore, properly overruled.

For the reasons stated, the judgments are affirmed.

*Judgments affirmed.*

CORRIGAN, P. J., concurs.
WASSERMAN, J., concurs in the judgment only.